IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| YUSUFU KUUMBA BEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 5:19-cv-236 (MTT) |
| | ) |
| GEORGIA DEPARTMENT OF CORRECTIONS, | ) |
| | ) |
| Defendant. | ) |

# ORDER

Plaintiff Yusufu Kuumba Bey, a Georgia state prisoner, contends that, for religious reasons, he should be allowed to grow his hair to a length of at least three feet. Georgia Department of Corrections' ("GDC") grooming policy, which GDC contends furthers several compelling interests, limits hair length to three inches. The Court held a bench trial on August 10, 2022 to resolve Bey's claim that GDC's grooming policy violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Doc. 126. Both Bey and GDC presented evidence and have submitted post-trial briefs. Docs. 129; 130. For the following reasons, judgment is entered in favor of GDC.

## I. PROCEDURAL BACKGROUND

Bey filed suit against GDC and multiple GDC officials and employees on June 14, 2019. Doc. 1. The defendants answered on December 20, 2019. Doc. 35. On July 7, 2020, Bey moved for a preliminary injunction, which the Court denied on July 29, 2020. Docs. 56; 61. After conducting discovery, all parties moved for summary

judgment (Docs. 62; 65; 79), and the Court dismissed Bey's First, Eighth, and Fourteenth Amendment claims. Doc. 102 at 5. The Court, however, denied both parties' motions on Bey's RLUIPA claim, and accordingly scheduled a bench trial. Doc. 102 at 5. The Court held a pretrial conference on July 19, 2022. Doc. 124. The Court clarified at the pretrial conference that under RLUIPA only injunctive relief was available and that GDC was the only appropriate defendant.[1] Bey, who had previously maintained that he should be permitted to grow his dreadlocks without limitation, modified his position at the pretrial conference. He now argues he should be allowed to grow dreadlocks to a length of at least three feet. Doc. 124. GDC stipulates that its grooming policy substantially burdens Bey's exercise of his religious beliefs. *Id*. Therefore, the sole issue for resolution is whether Bey's proposed alternative—to grow dreadlocks to a length of at least three feet—furthers GDC's asserted compelling interests.

Federal Rule of Civil Procedure 52(a) requires that "[i]n an action tried on the facts without a jury … the court must find the facts specially and state its conclusions of law separately." *Id*. After considering the evidence and the parties' briefs, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

Bey is a practicing Rastafarian. As a tenet of his Rastafarian faith, he must never cut his dreadlocks.[2] GDC's grooming policy limits hair length to three inches, prompting

---

[1] Bey did not object to the dismissal of all other defendants.

[2] Bey described dreadlocks as "coarse" and "matted" hair.

Bey's current request to grow his dreadlocks to a length of at least three feet.  Exhibit D-5 at 5 (Doc. 128-1).

Bey was convicted of murder, felony murder, and arson in 2001.  Exhibit D-6 at 2 (Doc. 128-9).  In 2018, he was transferred from Autry State Prison to Macon State Prison's TIER II administrative segregation unit after a riot at Autry.  Prison officials recommended this transfer after a TIER II Initial Segregation Review panel concluded that Bey was "a threat to the safe and secure operation of the facility and participated as a leader of [the] disruptive event at the facility."  Exhibit D-9 at 1 (Doc. 128-8).  The parties, and the Court from its experience, know well what TIER II administrative segregation means.  Yet the parties did not provide testimony on the subject.  However, the form for processing TIER II administrative segregation recommendations is in evidence and it states the criteria for assignment to TIER II, and they are listed in the margin.[3]  *Id* at 2.  In sum, inmates housed in the TIER II unit pose significant security risks.  At a hearing on the recommendation to move Bey to TIER II, Bey refused to make a statement.  *Id*. at 1.  Accordingly, the Classification Committee recommended Bey's transfer "to the TIER II program Phase I be approved immediately to ensure the security of the institution."  *Id.*  Further, Autry officials issued a Disciplinary Report

---

[3] "The offender is noted as a threat to the safe and secure operation of the Facility; Escape within the previous five (5) years involving violence or serious threat of violence; Escape(s) or escape attempts within the previous three (3) years from a state prison, County CI, or private prison; Leadership or Participation in a major disturbance or riot during the previous five (5) years involving: (a) ten or more offenders; and/or (b) the serious threat of loss of life or actual major property damage; Failure in the Tier I Program or refusal to participate; Participation as a leader or involvement in a major disruptive event, major disturbance, or directing the assault or homicide of other offender(s) during the previous five (5) years; Possession of a firearm or of an explosive device within the previous five years; Two or more disciplinary infractions for possession of a weapon within the past year; Three or more disciplinary charges within the previous 12 months that involve assaultive or excessive disruptive behavior of either Great or High severity level; Offenders with assaultive histories; Excessive destruction of state property; Transfer from GDCP SMU to a Tier II-Phase 3 or Tier II-Mental Health program; Attempting to introduce or trafficking of cellular devices, drugs, tobacco or other illegal contraband;" and/or "Assault on inmate with bodily harm[.]"  Exhibit D-9 at 2 (Doc. 128-8).

("DR") to Bey based upon an "investigation" revealing that Bey "was a major participant" in the riot.  Exhibit D-8 (Doc. 128-6).

However, there is substantial evidence that Bey did not participate in the riot.  First, Bey testified that he and everyone in his dormitory returned to their cells without incident when ordered.  Ahmed Holt, GDC's Assistant Commissioner of Facilities, confirmed Bey's testimony.  Second, Mary Banks, an Autry unit manager who apparently was supposed to confirm Bey's participation in the riot, testified on cross examination that "I'm not sure if [Bey] participated ... any or not."  Finally, there was no evidence Bey was found to have committed the two offenses alleged in the DR—"inciting a riot" and "failure to follow."  Exhibit D-8 (Doc. 128-6).

Based on the evidence, the Court cannot find that Bey actually participated in the riot.  Still, it is undisputed that Bey was transferred from Autry State Prison and placed in TIER II administrative segregation because of the conclusion that he was "a risk to the security and safety of the staff."  Exhibit D-9 at 1 (Doc. 128-8).  Thus, regardless of the reason or its merit, Bey is now housed at Macon State Prison, a Level 5 close security prison.[4]

Macon State Prison houses "inmates with the more aggressive DR history and sometimes … a lot of lifers, people that … probably won't hit the street no time soon.  Real violent inmates."  Of the 53,216 inmates housed by GDC in 2019, about 68 percent were violent and/or sexual offenders and 14,386 were associated with Security

---

[4] GDC classifies inmates by "security level," and "[o]ffenders classified as close security typically fall in one or more categories: escape risk, assault history, deemed dangerous, or have detainers for other serious crimes." Georgia Department of Corrections, *Close Security Facilities*, https://gdc.ga.gov/AboutGDC/FactSheets/close-security-facilities.  That too is not in evidence; the Court provides it for reference.  However, the evidence, as noted, is clear that Macon State Prison houses dangerous inmates.

Threat Groups.[5]  Exhibit D-7 at 23-25 (Doc. 128-2).  At trial, Holt testified that 74 percent of GDC's inmate population now are violent and/or sexual offenders.  Former Deputy Warden Peter Eaddie testified that 900 Security Threat Group gang members are housed at Macon State Prison.  In sum, it is clear, and the Court finds, that Macon State Prison houses inmates who pose serious security issues and who require intensive supervision and control.

Bey's disciplinary record includes a refusal to take a substance test in 2017, being under the influence of drugs in 2014, and possession of a cell phone in 2011.  Exhibit D-1 at 1 (Doc. 128-4).  His last violent infraction—assault without a weapon—occurred in January 2009.  *Id*. at 2.  Bey is not affiliated with any gangs at Macon State Prison, and therefore he is not a Security Threat Group offender.  Finally, Holt testified that the Macon State Prison administration has never complained about Bey's behavior.

GDC witnesses testified that, based on their experience, GDC's grooming policy serves multiple compelling interests.  First, limiting hair length is necessary to maintain security, particularly at Macon State Prison.  Foremost among GDC's security concerns is that inmates can easily conceal contraband in long hair.  Common types of contraband include weapons, typically shanks and razors, drugs, plastic handcuff keys, small cell phones, and money—all of which can be hidden in long hair.  Holt testified that, notwithstanding intensive contraband interdiction efforts, contraband still makes its way into GDC's prisons through drones, throwovers, visitors, and staff members.  Eaddie testified that he has found a paperclip and handcuff keys hidden in an inmate's hair.  Conversely, Bey testified that "[y]ou can't hide nothing in dreadlocks or sacred

---

[5] Security Threat Group offenders are inmates who are members of an Aryan, Black, Blood, Crip, Gangster Disciples, Ghostface Gangsters, Hispanic, or Hybrid gang.  *See* Exhibit D-7 at 25 (Doc. 128-2).

locks … It's not like locks can hold razors or metal objects." And in his post-trial brief, he argued that GDC's interest in regulating contraband is not compelling, "given the difficulty of hiding cell phones or sharp objects in 1-inch-wide holy locks." Doc. 129 at 4. Moreover, Bey testified that he has "never attempted to put anything inside [his] locks," and that his "locks have never caused a threat to security." But Bey does not dispute that Macon State Prison houses particularly dangerous inmates and that contraband pose security risks.

To combat contraband smuggling, GDC correctional officers conduct both regular and random "shakedowns" of inmates.[6] Long hair, Holt and Eaddie testified, increases the risk of injury to officers because searching long hair requires officers and an inmate to be "face to face" for longer periods. And because weapons such as shanks and razors are easily hidden in long hair, officers can be injured while feeling through an inmate's hair. For example, Eaddie testified that an officer could cut or puncture themselves on hidden razors or needles. Although metal detectors can be used in some, but not all, areas of Macon State Prison, much of the contraband that officers encounter is made of undetectable, but just as dangerous, material, e.g., plexiglass, plastic, and aluminum. Thus, physical searches are necessary even when metal detectors are available.

GDC witnesses also testified that limited resources, and the concomitant need to preserve resources, are significant security concerns. Eaddie testified, and documentary evidence confirms, that GDC has a staff shortage. For example, GDC's

---

[6] Holt described these individual searches: "Inmates are pulled to the side utilizing several devices that [GDC has]. One is a cell sense device and lot of it though is actually a pat search done by the officer where they are physically searching for items on the inmate's clothes, hair, in their hats, … et cetera."

correctional officer vacancy rate was 20.74 percent in 2019.  Exhibit D-7 at 12 (Doc. 128-2).  As noted, a search of an inmate with long hair takes more time—twice as long according to Eaddie—and thus requires more resources.  Further, Holt testified that a search of an inmate with dreadlocks three feet in length would require more than one officer.

Finally, with regard to GDC's security concerns, Holt and Eaddie testified that granting privileges to one inmate frequently causes jealousy among other inmates, which can lead to victimization of the privileged inmate.  Holt testified that privileged status "creates tension inside of [GDC's] facilities and [they] have to make sure that [they] maintain that and that is done by maintaining a standard clothing throughout the facility … [and] a standard haircut length."  Therefore, GDC issues inmates "the same clothing, the same shoes, the same T-shirts, underwear, hats … So all of the things that they are alleged to be issued are standard in scope."

Based on the evidence, it is clear, and the Court finds, that GDC has established by a preponderance of the evidence that it has compelling interests in minimizing security risks, particularly at Macon State Prison, by contraband interdiction, preserving limited resources, and maintaining inmate uniformity.  The Court further finds that limiting hair length furthers those interests.

Next, Holt testified that it is important to ensure that inmates can be readily identified.  Long hair, according to Holt, provides inmates with the means to change their appearance and thereby thwart identification.  For example, if an inmate were to escape, he could easily change his appearance by cutting his hair.  Holt cited an incident involving an escapee who was "unrecognizable" after cutting his hair.  Bey does

not dispute the necessity of ensuring ready and accurate identification of inmates, but countered that GDC could photograph him with his dreadlocks pulled back.

Based on the evidence, it is clear, and the Court finds, that GDC has established by a preponderance of the evidence that it has a compelling interest in ensuring ready and accurate identification of inmates. The Court further finds that limiting hair length furthers that interest.

Finally, GDC witnesses testified that GDC has a compelling interest in inmate hygiene. Holt testified that inmates must maintain proper hair hygiene because "if they aren't sanitary that … creates issues amongst roommates, amongst other inmates in the dorm, up to and including assault." Moreover, both Holt and Eaddie testified that lice can thrive in an inmate's unclean long hair, and lice outbreaks require broad quarantine measures. In response, Bey testified that he has "never had dirty hair. [Officers] have never searched [him] for dirty hair. As far as [his] religion goes [he] must frequently wash and anoint [his] hair with oil." The Court has no reason to doubt Bey's testimony, but it is clear, and the Court finds, that GDC has established by a preponderance of the evidence that it has a compelling interest in appropriate inmate hygiene and that limiting hair length furthers that interest.

## III. CONCLUSIONS OF LAW

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution … unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).

Courts analyze RLUIPA claims under a burden-shifting test. *Holt v. Hobbs*, 574 U.S. 352, 362 (2015). The "plaintiff bears the initial burden of proving that a prison policy 'implicates his religious exercise.'" *Ramirez v. Collier*, __ U.S. __, 142 S.Ct. 1264, 1277 (2022) (citing *Holt*, 574 U.S. at 360). RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). However, "a prisoner's request for an accommodation must be sincerely based on a religious belief and not some other motivation." *Holt*, 574 U.S. at 360-361.

If a plaintiff satisfies his burden of proving that the defendant substantially burdened his exercise of religion, the burden shifts to the defendant to show that its policy "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that governmental interest." 42 U.S.C. § 2000cc-1(a); *see also Holt*, 574 U.S. at 362. To carry its burden, the defendant is "only required to prove that [*plaintiff*]'*s proposed alternatives* would not sufficiently serve its [compelling governmental] interests." *Smith v. Owens*, 13 F.4th 1319, 1326 (11th Cir. 2021) (citation and internal quotation marks omitted). In *Owens*, the Eleventh Circuit held the district court erred when it fashioned a remedy that the plaintiff did not seek. *Id*. at 1326. Therefore, the defendant is "not required to refute every conceivable option," but is "required to refute only the *one alternative* [the plaintiff] proposed[.]" *Id*. (emphasis added) (internal quotation marks and citation omitted).

Finally, RLUIPA requires an individualized inquiry—"[t]he government must 'demonstrate that the compelling interest test is satisfied through application of the challenged law "to the person"—the particular claimant whose sincere exercise of

-9-

religion is being substantially burdened.'" *Id.* at 1328 (quoting *Holt*, 574 U.S. at 363). However, the Supreme Court has made clear that RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005). Thus, a court "must give 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Owens*, 13 F.4th at 1329 (quoting *Cutter*, 544 U.S. at 723).

GDC stipulates that its grooming policy substantially burdens Bey's religious exercise. Therefore, the Court proceeds to analyze whether GDC has proven that Bey's proposed alternative—to allow him to grow his dreadlocks to a length of at least three feet—does not sufficiently further GDC's compelling interests. Pursuant to *Owens*, the Court will not consider any other alternatives. 13 F.4th at 1326.

Although the question of whether Bey's proposed alternative would allow GDC to further its compelling interests is a case-specific inquiry, the Eleventh Circuit's decision in *Knight v. Thompson* is generally instructive. 797 F.3d 934 (11th Cir. 2015). There, male Native American inmates challenged an Alabama Department of Corrections' policy prohibiting unshorn hair, a policy contrary to the inmates' religious beliefs. *Id.* at 937. The Eleventh Circuit concluded that "[i]t is … beyond dispute that the [Alabama Department of Corrections] has compelling interests in security, discipline, hygiene, and safety within its prisons and in the public's safety in the event of escapes and alteration of appearances," and that "[a]llowing male inmates to wear long hair carries with it established costs and risks." *Id*. at 944, 948. GDC asserts that substantially the same

interests are furthered by its hair length policy.  The Eleventh Circuit concluded that the Alabama Department of Corrections met its burden by showing "that Plaintiffs' proposed alternative—allowing an exemption for Native American inmates [to wear unshorn hair] … —does not eliminate [its] security, discipline, hygiene, and safety concerns.  As the District Court found, inmates can manipulate searches of their own hair to conceal weapons and contraband."  *Knight*, 797 F.3d at 945.  Again, *Knight* does not dictate the result here, but it nonetheless is persuasive.

The Court first addresses Bey's overarching argument.  Most prison systems, Bey argues, do not strictly regulate hair length.  Extrapolating from this, Bey argues GDC has failed to carry its burden of demonstrating that its grooming policy is the least restrictive means to serve its interests.  *See* Doc. 129 at 6.  As noted by the Eleventh Circuit in *Knight*, this argument largely "misses the mark."  797 F.3d. at 947.  The question is not what might suit other institutions.  The question is what is necessary to further GDC's particular compelling interests and, more specifically, what is necessary to further those interests at Macon State Prison, a Level 5 close security facility housing inmates in TIER II administrative segregation.  "While the practices of other institutions are relevant to the RLUIPA analysis, they are not controlling—the RLUIPA does not pit institutions against one another in a race to the top of the risk-tolerance or cost-absorption ladder."  *Id*.

Bey also points to GDC's accommodations in other cases.  That too sheds no helpful light on Bey's request for a three-foot hair length accommodation.  For example, Bey cites the case of a "'Torah-observant Jew'" who is allowed to grow earlocks, which consist of hair growing from the area in the front of the ears.  *Benning v. Georgia*, 845 F.

Supp. 2d 1372 (M.D. Ga. 2012); *Benning v. Georgia*, 864 F. Supp. 2d 1358 (M.D. Ga. 2012).  However, the court's order in *Benning* did not allow unlimited or even lengthy earlocks.  On the contrary, *Benning* only prohibited prison officials from trimming Benning's earlocks "'close to the skin, as with a razor,'" a practice prohibited by Benning's sincerely held religious beliefs.  864 F. Supp. 2d at 1370.  Otherwise, the defendants were allowed to trim Benning's earlocks with scissors.  *Id*.  Unshaved but scissors-trimmed earlocks compare not at all to three-foot dreadlocks.

In sum, what is allowed in other jurisdictions or other situations is not at all determinative.  The Court is guided by the evidence in this case and the conditions in GDC's prisons, particularly at Macon State Prison.

### A. GDC's Interests in Prison Security

The evidence establishes beyond reasonable dispute, and the Court has found, that GDC has compelling security interests and that limiting hair length serves these interests.  Bey raises no serious challenge to the general proposition that long hair can pose security issues.  He does, however, quibble with how easily contraband can be hidden in long hair, and he argues that self-searches could reduce the risks associated with more lengthy searches required for longer hair.  Doc. 129 at 5.  The Court rejects these arguments.  The evidence establishes that contraband can be hidden in longer hair and that self-searches are not a viable alternative to officer-conducted searches.

Bey's real argument is that if *he* is allowed to grow his dreadlocks to three feet, *he* would not pose a security risk.  Bey notes, correctly, that RLUIPA requires an individualized inquiry and that *he*, he says, is not a security risk.  Given the Court's inability to conclude that Bey instigated the Autry riot and Bey's *relatively* benign

disciplinary record, it perhaps is likely that Bey is not a typical TIER II administrative segregation inmate. Still, he is a convicted murderer[7] and his disciplinary record is only relatively benign. For example, he has been cited for drug use and possessing contraband, two of the security threats addressed by the hair length policy. And even when conducting an individualized inquiry, the Court must consider the fact that Bey is housed with inmates who without doubt pose serious security threats, and GDC has an extremely compelling interest in minimizing the risk that *anyone* in such an inmate population is capable of hiding contraband. Bey's proposed alternative undermines that interest.

The Court has also found that GDC's security interests are furthered by measures that conserve its limited resources. The additional time and manpower required to search an inmate's long hair is not an efficient use of GDC's limited resources, especially considering the intensive supervision required at Macon State Prison. Furthermore, the Court must give due deference to prison officials' decisions on how to utilize resources. *See Cutter*, 544 U.S. at 723 (finding that courts should apply RLUIPA's "standard with due deference to the experience and expertise of prison and jail administrators[.]") (citation and internal quotation marks omitted). Accordingly, the Court concludes that GDC's interest in conserving limited resources would not be furthered by Bey's proposed alternative.

Finally, the Court has found that maintaining inmate uniformity furthers GDC's security interests. However, the Court does not give uniformity substantial weight. The very purpose of RLUIPA is to accommodate inmates' religious beliefs, which

---

[7] Bey adamantly maintains that he was wrongfully convicted.

-13-

necessarily means some inmates will have "privileges" not enjoyed by others.  See *Cutter*, 544 U.S. at 720 (stating that RLUIPA is "a permissible legislative accommodation of religion that is not barred by the Establishment Clause.").  If maintaining inmate uniformity was the only compelling security interest advanced by GDC, the question of whether Bey's proposed alternative would sufficiently serve that interest would be a close call.  Nonetheless, Bey's proposed alternative undermines, somewhat, GDC's need to maintain inmate uniformity and thus it is appropriate to take account of that as the Court determines whether Bey's proposed alternative sufficiently serves GDC's compelling security interests.

The Court has carefully considered GDC's security interests—contraband interdiction, conserving resources, and maintaining inmate uniformity—and Bey's proposed alternative.  Taken as a whole, the Court concludes that GDC's security interests would be significantly undermined, and thus clearly would not be served, by Bey's proposed alternative.

## B.  GDC's Interest in Inmate Identification

The evidence establishes, and thus the Court has found, that GDC has a compelling interest in the quick and reliable identification of inmates and that its grooming policy furthers this interest.  See *Hobbs*, 574 U.S. at 365 (ruling "that prisons have a compelling interest in the quick and reliable identification of prisoners"); *see also Knight*, 797 F.3d at 934, 944 (stating that "[i]t is … beyond dispute that the [Alabama Department of Corrections] has compelling interests in … the public's safety in the event of escapes and alteration of appearances.").

Bey claims that his dreadlocks would not create identification issues because he could be photographed with his dreadlocks pulled back. Perhaps that is possible. But the Court does not find this convincing. A photograph of an inmate with three feet of hair tucked behind his head likely would not be useful if the inmate shaved his head. And while there is no evidence that Bey has ever attempted to escape, that does not obviate GDC's need for quick and reliable means of identification, which is entirely premised on what *may* happen if an inmate were to escape.

Therefore, the Court concludes that GDC's compelling interest in quick and reliable inmate identification would not be furthered by Bey's proposed alternative.

### C.  GDC's Interest in Inmate Hygiene

Finally, the Court has found that GDC has established that it has a compelling interest in inmate hygiene and that its grooming policy serves this interest. *See Knight*, 797 F.3d at 944 (finding it undisputed that the Alabama Department of Corrections has a compelling interest in hygiene "within its prisons.").

Based on its individualized inquiry, the Court does not accord GDC's general interest in maintaining hygiene substantial weight. Bey credibly testified that his religious beliefs require him to keep his dreadlocks clean. If he fails to do so, there is no evidence that GDC could not rescind his accommodation or otherwise address hygiene issues, as prison officials surely must do, before the lack of hygiene disrupted prison life. Perhaps GDC could have established that enforcing good hygiene is burdensome, but it did not. Accordingly, the Court does not find that this interest would not be furthered if Bey were allowed to grow his dreadlocks to a length of at least three feet.

## IV.  CONCLUSION

GDC admits its grooming policy substantially burdens Bey's sincerely held religious beliefs.  However, GDC has carried its burden of proving that Bey's proposed alternative—growing dreadlocks to a length of at least three feet—would not sufficiently serve GDC's compelling interests in maintaining security and in maintaining quick and reliable means of inmate identification.  Therefore, judgment shall be entered for GDC.

**SO ORDERED**, this 29th day of September, 2022.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
